**SMITH–CORONA GROUP, CONSUMER PRODUCTS DIVISION, SCM Corporation, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Brother Industries, Ltd., and Brother International Corporation, and Silver Reed America, Inc., and Silver Seiko, Ltd., Parties-in-Interest.**

**Court No. 80–9–01343.**

United States Court of International Trade.

Dec. 30, 1980.

Eugene L. Stewart, Washington, D. C., and Terence P. Stewart, for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Director, Commercial Litigation Branch, and Velta A. Melnbrencis, Asst. Branch Director, New York City), for defendant.

Tanaka, Walders & Ritger, Washington, D. C. (H. William Tanaka, Donald L. E. Ritger and Wesley K. Caine, Washington, D. C., of counsel), for Brother Industries, Ltd., and Brother Intern. Corp., party-in-interest.

Arter, Hadden & Hemmendinger, Washington, D. C. (William Barringer and Christopher A. Dunn, Washington, D. C., of counsel), for Silver Reed America, Inc., and Silver Seiko, Ltd., party-in-interest.

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR IN-JUNCTIVE AND INCIDENTAL RE-LIEF, AND PARTY–IN–INTEREST'S CROSS–MOTION TO DISMISS.

NEWMAN, Judge:

Plaintiff, a well known domestic manufacturer of portable electric typewriters ("PETS"), seeks judicial review of an "Early Determination of Antidumping Duties" by the International Trade Administration, United States Department of Commerce ("Commerce"), published in the *Federal Register* on August 13, 1980 (45 FR 53853–56). This determination, made pursuant to

section 736(c) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (P.L. 96–39, 93 Stat. 144) (19 U.S.C. § 1673e(c)), concerns certain PETs from Japan manufactured and imported by the parties-in-interest, Brother and Silver, and entered, or withdrawn from warehouse, for consumption on or after January 4, 1980 to May 7, 1980.[1] Plaintiff predicates subject matter jurisdiction on section 516A(a)(2)(A) and (B)(iii) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (19 U.S.C. § 1516a(a)(2)(A) and (B)(iii)), raising an issue of novel impression. Under the recently enacted Customs Courts Act of 1980, P.L. 96–417, 94 Stat. 1727, effective November 1, 1980, the Court of International Trade has exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930. 28 U.S.C. § 1581(c).

Presently before the Court is plaintiff's application under section 516A(c)(2) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (19 U.S.C. § 1516a(c)(2)), to enjoin the liquidation of the entries that were the subject of Commerce's early determination of antidumping duties pending the final hearing and disposition on the merits of the action. Additionally, plaintiff requests certain incidental relief, which will be discussed *infra.*

Brother has filed a cross-motion to dismiss for lack of subject matter jurisdiction, which cross-motion is opposed by plaintiff and the Government. Silver does not challenge the Court's jurisdiction (Trans. Oral Arg., 71).[2]

## BACKGROUND

On May 9, 1980 Commerce published an Antidumping Duty Order covering imports of PETs from Japan. 45 FR 30618–19.[3] The order provided that all entries of PETs imported from Japan subject to the "Withholding of Appraisement" notice published on January 4, 1980 were liable for possible assessment of antidumping duties. Further, the order directed Customs officers to require a deposit of estimated antidumping duties pending liquidation of entries in the following amounts: 36.53 percent ad valorem for Silver, and 48.70 percent ad valorem for Brother.

In lieu of the deposit of estimated antidumping duties, Commerce may permit the posting of a bond or other security for a period not to exceed ninety days from the date of publication of an antidumping duty order. This alternative is available where Commerce is satisfied, based on information presented to it by a manufacturer, producer, or exporter, that it will be able to determine within ninety days of publication date of the order the foreign market value and the United States price for all merchandise of such manufacturer, producer, or exporter that was entered, or withdrawn from warehouse, for consumption between the date of publication of the affirmative preliminary less than fair value ("LTFV") determination and the date of publication of the International Trade Commission's affirmative final determination. 19 U.S.C. § 1673e(c)(1).

The results of Commerce's determination of foreign market value and United States price serve as the basis for the assessment of antidumping duties on all entries of the merchandise covered by the determination, viz., entries that were made between publication date of the affirmative preliminary LTFV determination and publication date of the affirmative final injury determina-

---

1. January 4, 1980 was the date of publication by the Treasury Department of its tentative determination of sales at less than fair value, and the date on which liquidation was suspended (44 FR 1220); May 7, 1980 was the date of publication by the International Trade Commission of its affirmative final injury determination (45 FR 30188).

2. On October 14, 1980, oral argument was heard on plaintiff's requested injunctive and incidental relief, and Brother's cross-motion to dismiss.

3. That antidumping duty order is *sub judice* in *Nakajima All Co., Ltd. v. United States,* Court No. 80–6–00933; and in *Silver Reed America, Inc., et al. v. United States,* Court No. 80–6–00934. Plaintiff, SCM, is a party intervenor in both actions.

tion. The results also serve as the basis for the deposit of estimated antidumping duties on future entries of merchandise from the particular foreign interested party. 19 U.S.C. § 1673e(c)(3).

In a notice published in the *Federal Register* on May 30, 1980 Commerce stated that Brother and Silver had requested that the deposit of estimated antidumping duties provided for in the Antidumping Duty Order be waived, and that an early determination of antidumping duties be made. Commerce advised that it was satisfied from the information presented by these two Japanese manufacturers that it would be able to timely make the requisite determination for all entries of merchandise of such manufacturers. 45 FR 36464. Commerce further stated (*ibid.*):

Accordingly, Customs officers are being directed to waive deposit of estimated duty and accept the posting of a bond or other security for all entries of portable electric typewriters manufactured by Brother Industries and Silver Seiko entered or withdrawn from warehouse, for consumption, from the date of publication of this notice.

The results of the early determination of antidumping duties respecting PETs from Japan manufactured by Brother Industries and Silver Seiko were published in the *Federal Register* on August 13, 1980. In its notice, Commerce explained the manner of computing the foreign market value and the United States price of all entries of the subject merchandise made from January 4, 1980, to May 7, 1980. The results of the comparisons of foreign market value and the United States price were summarized as follows (45 FR at 53855):

Margins were found on 74 percent of sales compared. The weighted average margin found with respect to sales by Silver Seiko was 14.91 percent and with respect to sales by Brother was 5.31 percent.

Accordingly, Commerce determined that the United States price of Brother and Silver PETs "are less than the foreign market values of such or similar typewriters," (*ibid.*) and then advised:

Customs officials will be directed to assess antidumping duties equal to the amount determined by the Department during this proceeding for all entries of portable electric typewriters manufactured by Brother and Silver Seiko entered or withdrawn from warehouse for consumption on or after January 4, 1980 to May 7, 1980. [*Ibid.*]

Additionally, it was announced that Customs officers were being directed to require the deposit of estimated antidumping duties on all PETs from Japan entered or withdrawn from warehouse for consumption. In that connection, Commerce announced: (45 FR at 53856):

The estimated antidumping duty deposit required for entries of the subject merchandise shall be 14.91 percent for Silver Seiko; 5.31 percent for Brother; * * *

Significantly too, the notice of August 13, 1980 stated Commerce's intent that, for purposes of the assessment of antidumping duties on the entries subject to the determination under section 736, the determination constitutes the completion of a review under section 751 of the Act which vests in all interested parties the rights flowing from the completion of such a review.

In this action, plaintiff challenges Commerce's allowance of certain adjustments to the foreign market values for Brother's and Silver's PETs, which adjustments were made for the purpose of comparing either the purchase price or the exporter's sales prices, as appropriate, with the foreign market values and thereby arriving at the proper antidumping duties to be assessed. The contested adjustments include, *inter alia* : (a) allowances for differences in Japanese inland freight; (b) allowances for differences in merchandise; and (c) allowances for differences in circumstances of sale, including expenses for packing, rebates, and advertising and the so-called exporter's sales price offset.

The purpose of plaintiff's application is to enjoin the liquidation of entries made on or after January 4, 1980 to May 7, 1980, so

that such entries may be assessed with antidumping duties in the proper amounts, as determined by this Court. Moreover, plaintiff seeks an order requiring the deposit by Brother and Silver of estimated antidumping duties in accordance with the terms of the Antidumping Duty Order, respecting all entries, or withdrawals, of the subject merchandise made since January 4, 1980, pending liquidation in conformance with the final decision of this Court.

## JURISDICTION

We first consider the threshold jurisdictional issue raised by Brother's cross-motion to dismiss—an issue of first impression.

The nub of Brother's challenge to the Court's jurisdiction is that this action seeks review of a determination made under section 736(c) of the Tariff Act, and that under section 516A judicial review is not provided with respect to a section 736(c) determination.[4]

In their opposition to Brother's cross-motion, plaintiff and the Government argue that while section 516A does not specifically list determinations made pursuant to section 736 of the Act among those reviewable, an examination of the statutory scheme in its entirety, pertinent legislative history, and the contested determination itself, demonstrate that the Court has jurisdiction over this action.[5]

For the reasons advanced by plaintiff and the Government, I have concluded that Brother's jurisdictional challenge is without merit.

Brother's cross-motion to dismiss for lack of subject matter jurisdiction has raised a novel issue, viz., whether the Court has jurisdiction under section 516A to review an antidumping duty assessment determination made by Commerce prior to the annual review determination required by section 751(a) of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979. In light of the anticipated extensive use of section 736(c) in antidumping duty proceedings, the significance of the jurisdictional question cannot be overemphasized.

While there can be no doubt Congress intended that antidumping duty assessment determinations may be reviewable by this Court, admittedly section 516A does not expressly mention section 736 determinations among those set forth as reviewable. Nonetheless, from the legislative history of the Trade Agreements Act of 1979, it is evident that section 736(c) simply authorizes a "fast-track" section 751(a) review and determination, and therefore an "early determination" of antidumping duties pursuant to section 736(c) is reviewable as a section 751(a) determination.

Congressional intent that an early determination of antidumping duties made under section 736(c) should be also considered as a determination under section 751, is demonstrated by the reports of both committees that were instrumental in drafting the Trade Agreements Act of 1979.

Thus, the *House Ways and Means Committee Report No. 96–317*, 96th Cong., 1st Sess. (1979) states (page 70):

Further, the bill provides a limited exception to the requirement of a deposit of

---

4. Inasmuch as this action was filed and briefs submitted prior to November 1, 1980, effective date of the Customs Courts Act of 1980, the parties have not addressed the question of whether the Court's residual jurisdiction under 28 U.S.C. § 1581(i) would be applicable in the event that the Court should find that the instant action does not fall within the purview of section 516A. See *H.R.Rep.No.96–1235*, 96th Cong., 1st Sess. 48 (1980), U.S.Code Cong. & Admin.News 1980, p. 7088; *Royal Business Machines, Inc. v. United States et al.*, 507 F.Supp. 1007, 1 CIT —— (1980). In view of the conclusions reached in this opinion, it is unnecessary to consider that issue.

5. Interestingly, Brother itself has filed an action challenging Commerce's early determination of August 13, 1980 (Court No. 80–9–01436), but counsel for Brother has characterized that action as "essentially protective in nature, and will be pursued only if this Court * * * finds [that it has] jurisdiction". (Brother's memorandum, at 7, footnote 2.)

Contemporaneously with this application and order, I have granted Brother's application for consolidation of the instant action with Court No. 80–9–01436.

estimated duties for importers who have taken steps to eliminate or substantially reduce dumping margins between the date of an affirmative preliminary determination by the Authority and the final affirmative determination by the ITC. Thus, for a three month period following the issuance of an antidumping order, the Authority may continue to permit entry of merchandise subject to the order under bond for individual importers if it has reason to believe that those importers have taken steps to revise their prices to result in a significantly lower dumping margin. *During this three-month period, the Authority will examine the merchandise entered during the period between its preliminary and the ITC's final determination. If assessment on these entries can be made within the three month period in accordance with the procedures of section 751, then assessment will take place and the new dumping margins derived from this assessment will serve as the basis for the deposit of estimated duties on future entries.* [Emphasis added].

Similarly, the *Senate Finance Committee Report No. 96–249*, 96th Cong., 1st Sess. (1979), U.S.Code Cong. & Admin.News 1979, p. 381, commented (page 75):

Generally, estimated duty deposits equal to the amount of the estimated antidumping duty would be required to be deposited at the same time as estimated normal customs duty deposits must be made with respect to the merchandise under section 505(a) of the Tariff Act of 1930 (19 U.S.C. 1505). However, the administering authority could permit the importer to post a bond or other security in lieu of estimated antidumping duty deposits for not more than 90 calendar days after the date on which the antidumping duty order is published under certain conditions. *The manufacturer, producer, or exporter of the merchandise would be required to supply the authority sufficient information relating to entries of the merchandise made after the date of the preliminary determination by the authority and before the date of the final determination by the ITC to enable the authority to determine the amount of antidumping duties on that merchandise under section 751(a) of the Tariff Act. If the authority permits the posting of bonds or other security in lieu of estimated duty deposits and makes a determination under section 751, then that determination would be the basis for the assessment of antidumping duties imposed on entries made before the date of the affirmative determination of the ITC.* That determination would also be the basis for the deposit of estimated antidumping duties on entries of merchandise by the manufacturer, producer, or exporter who supplies the information, made on or after the earlier of the date on which the determination is made under section 751(a) or the 90th day after the date on which the antidumping duty order is published. [Emphasis added.]

■ While the principle respecting the strict construction of statutes waiving the sovereign immunity of the United States is well settled,[6] the plain indication of Congressional intent concerning the interplay of section 736(c) and 751(a) cannot be ignored. *Cf. SCM Corporation v. United States, Brother International Corp., Party-in-interest*, 80 Cust.Ct. 226, C.R.D. 78–2, 450 F.Supp. 1178 (1978) (Court's jurisdiction to review negative injury determinations in antidumping proceedings gleaned from Congressional intent).

In this case, based upon the information submitted by Brother and Silver pursuant to section 736(c), Commerce first found that it could make an early antidumping duty determination within ninety days after the publication of the Antidumping Duty Order of May 9, 1980. Consequently, on May 30, 1980 Commerce permitted Brother and Silver to post bonds or other security in lieu of estimated dumping duties for merchandise entered, or withdrawn from warehouse, for consumption on or after May 30 and before August 8, 1980. 45 FR 36464. Subsequent-

---

**6.** See *United States v. Boe*, 64 CCPA 11, C.A.D. 1177, 543 F.2d 151 (1976).

ly, Commerce proceeded to determine the foreign market values and United States prices for the merchandise involved. On August 13, 1980 Commerce published its early determination, which not only included a determination of the amount of estimated duties to be deposited regarding future entries, but also included the foreign market values and the United States prices for the merchandise involved, along with certain adjustments to permit their comparison. Plainly, then, Commerce had conducted a review and determination of antidumping duties as provided in section 751. Hence, Commerce correctly observed that its early determination under section 736(c) also constituted the completion of a review under section 751, and expressly so stated in its published determination. 45 FR 58355.

■ In sum, since Commerce made a section 751 determination for purposes of section 736(c)(2), and since section 751 is specifically reviewable pursuant to section 516A, the early antidumping duty determination in this case is reviewable by this Court pursuant to section 516A.

Brother's memorandum notes the above cited legislative history, but maintains that it should not be used to create ambiguity in sections 736(c) and 751, which provisions according to Brother are clear on their face, and consist of distinct provisions of law, each section being self-contained and serving its own purpose. Continuing, Brother points out that the introductory language of section 751(a) directs the administering authority to review and determine the amount of any antidumping duty "[a]t least once during each 12-month period *beginning on the anniversary of the date of publication of * * * an antidumping duty order*". (Emphasis added.) From this language Brother concludes that by its terms, section 751(a) reviews comprise only those which are initiated *after* the anniversary date of an antidumping order so that an early antidumping duty determination cannot qualify as a section 751 determination. I am unable to agree with such narrow construction of the statute.

■ The introductory language in section 751(a) merely mandates the administering authority to make a review and determination of antidumping duties once every 12 months following the anniversary date of the antidumping duty order. It does not preclude the Department from making a section 751 determination at an earlier date. That a section 751 determination, such as made here, could be made during the ninety day period following the publication of the antidumping duty order, as may be noted above, is clearly reflected in legislative history.

Admittedly, on a cursory reading of the statutes the relationship between section 736 and 751 is not immediately apparent. Nonetheless, upon careful analysis it becomes apparent that section 736(c) is not an independent, self-contained provision, as insisted by Brother, but rather section 736(c) depends for its effectiveness upon section 751(a). Consequently, Congress did not provide for judicial review of section 736(c) determinations for the simple reason that the significant determinations are all made in accordance with section 751(a) procedures, explicitly reviewable under section 516A. Accordingly, the cross-motion by Brother to dismiss this action for lack of subject matter jurisdiction is denied.

## INJUNCTION

We turn to plaintiff's application for injunctive relief pursuant to 19 U.S.C. § 1516a(c)(2).

In subsection (c)(1) of section 516A, 19 U.S.C. § 1516a(c)(1), Congress provided that unless liquidation is enjoined by the Court, entries of merchandise of the character covered by a determination contested under subsection (a) of section 516A shall be liquidated in accordance with the administrative determination, if they are entered, or withdrawn from warehouse, for consumption on or before the date of publication in the *Federal Register* of a notice of a decision of the Customs Court (renamed United States Court of International Trade, effective November 1, 1980), or of the Court of Customs and Patent Appeals, not in harmony with that determination.

In subsection (c)(2) of section 516A, 19 U.S.C. § 1516a(c)(2), Congress permitted the Customs Court to enjoin the liquidation of some or all entries of merchandise covered by a determination upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances. Under the statute, in ruling on a request for injunctive relief the Court must consider, among other factors, whether:

(A) the party filing the action is likely to prevail on the merits,

(B) the party filing the action would be irreparably harmed if liquidation of some or all of the entries is not enjoined,

(C) the public interest would best be served if liquidation is enjoined, and

(D) the harm to the party filing the action would be greater if liquidation of some or all of the entries is not enjoined than the harm to other persons if liquidation of some or all of the entries is enjoined.

The foregoing statutory factors have long been recognized by federal courts in granting preliminary injunctive relief. See, e. g., *Virginia Petroleum Jobbers Association v. F.P.C.*, 259 F.2d 921, 925 (D.C.Cir.1958). See also *Zenith Radio Corporation v. United States*, 505 F.Supp. 216, 1 CIT —— (1980); and *Di Jub Leasing Corp., et al. v. United States, et al.*, 505 F.Supp. 1113, 1 CIT —— (1980).

The entries subject to liquidation with assessment of antidumping duties based upon the early determination published on August 13, 1980, which plaintiff contests in this action, are the entries of PETs manufactured by Brother Industries and Silver Seiko and entered, or withdrawn from warehouse, for consumption from January 4, 1980 to May 7, 1980.

■ I have carefully considered, among other things, the four factors delineated in the statute, and have concluded that under the facts and circumstances presented herein injunctive relief is warranted respecting the above-mentioned entries.

Plaintiff claims on the merits that Commerce improperly allowed certain adjustments (noted *supra*) to be made to the homemarket price of each model typewriter such as or similar to an imported model, for the purpose of computing statutory foreign market value. The result of any improper adjustment, of course, would reduce the foreign market value, and thereby diminish the difference between such value and the United States price of the imported articles, viz., reduce or eliminate the dumping margin. *H.R.Rep.No.96–317*, 96th Cong., 1st Sess. 76 (1979). The merits present a number of highly complex issues which have been but briefly argued by the parties in their memoranda of law submitted to the Court in connection with plaintiff's present application. While I have not arrived at a final decision as to the propriety of any or all of the contested adjustments, at this juncture I have concluded from the arguments presented that plaintiff is likely to prevail on the merits.

Additionally, I find that plaintiff would suffer irreparable harm if liquidation of the entries covered by the early antidumping determination were not enjoined. It appears that in 1980 plaintiff has continued to experience substantial adverse operating results in its PET business, at least partly due to the less than fair value sales by the Japanese manufacturers. To buttress its argument that injunctive relief is necessary to prevent irreparable harm to its PET business, plaintiff cites statistics showing that increased imports of PETs from Japan in 1980 over 1979 have captured an additional share of the market this year at the expense of plaintiff. Moreover, plaintiff's statistics demonstrate that plaintiff continues to suffer a decline in: operating income, return on net sales, production and United States sales. Plaintiff has also shown that its inventories of United States produced PETs have substantially increased, and that there has been a continuation of price suppression.

It further appears from an affidavit executed by plaintiff's vice-president and general manager that substantial numbers of Japanese made PETs imported earlier this

year remain in inventory. Liquidation of the subject entries prior to the final decision in this case would allow any inventoried units to escape the imposition of the correct amount of antidumping duties if plaintiff prevailed on any of the contested adjustments to the foreign market value.

Generally, the public interest is best served by preventing entries subject to assessment of antidumping duties from escaping the correct amount of such duties. This public interest result may be achieved by the procedural safeguard of an injunction *pendente lite* to maintain the *status quo* of the unliquidated entries until a final resolution of the merits.

The parties-in-interest argue that granting injunctive relief to plaintiff would restrict competition and enhance plaintiff's potential monopoly position in the PET business. While Brother notes that in 1975 the Antitrust Division of the Department of Justice opposed plaintiff's antidumping petition on antitrust grounds, nevertheless I have also noted with great interest that presently there is not even a suggestion by the Government in its opposition to plaintiff's application that there may be any monopoly or antitrust implication if liquidations are enjoined. Further, Silver's claim that granting injunctive relief would result in higher consumer prices for PETs is purely conjectural.

Finally, I find that any harm to the parties-in-interest that would result from enjoining liquidations (*e. g.*, pricing uncertainty) is substantially outweighed by the harm that would result to plaintiff if injunctive relief were denied. The existence of the present litigation, as well as the litigation brought by Brother and Silver, make it impossible at this stage to fix with certainty the amount of antidumping duties that may eventually be assessed on merchandise entered after May 7, 1980. Consequently, the cost and pricing uncertainties experienced by the parties-in-interest will continue whether or not this Court enjoins the liquidation of entries made before May 7, 1980.

While the Court is mindful that Congress intended injunctive relief under section 516A(c)(2) should be regarded as "truly an extraordinary measure and that the relief should not be granted in the ordinary course of events" (*S.Rep.No.96–249*, at 253, U.S.Code Cong. & Admin.News 1979, p. 639), under all the facts and circumstances, I find that the requested injunctive relief has been fully justified, notwithstanding the commercial uncertainty relating to the suspension of liquidation. In short, if plaintiff should prevail on the merits, liquidation of the involved entries on the basis of the August 13, 1980 determination would further compound the injury to plaintiff resulting from the less than fair value sales of the Japanese PETs, and such injury would be irreparable.

## INCIDENTAL RELIEF

Lastly, we come to plaintiff's request for certain incidental relief. Specifically, plaintiff requests this Court to direct that there be collected a deposit of estimated antidumping duties on all PETs manufactured by Brother Industries and Silver Seiko entered, or withdrawn from warehouse, for consumption on and after January 4, 1980, in the amount of 48.70 per cent ad valorem for Brother and 36.53 per cent ad valorem for Silver, as specified in the Antidumping Duty Order issued on May 9, 1980.

I agree with Silver's contention that the Court lacks authority to direct the deposit of estimated duties in an amount other than ordered by Commerce in the contested determination of August 13, 1980 until after there has been a full review of the merits; and that there should not be any modification of the amount of such deposits as incidental to granting an injunction *pendente lite*.

To suspend Commerce's determination of August 13, 1980 and order the deposit of estimated duties in the amounts set forth in the Antidumping Duty Order published on May 9, 1980 would, in effect, prejudge the merits of the instant case at this early stage as part of the expedited procedures accompanying an application for a preliminary

injunction. What is more, if this Court were to require deposits of estimated duties in amounts that are different than those prescribed by the contested determination, the Court would effectively be destroying the *status quo*, which is one of the fundamental purposes of granting injunctive relief *pendente lite*. *Cf. Industrial Fasteners Group, American Importers Association v. United States*, 85 Cust.Ct., C.R.D. 80–8, 495 F.Supp. 911 (1980); See also *S.Rep.No.96–249*, 96th Cong., 1st Sess. 252–253 (1979).

Silver also points out that the rates which plaintiff now seeks as a basis for deposits of estimated duties (viz., those determined in the Antidumping Order of May 9, 1980) are predicated upon the same categories of adjustments now challenged by plaintiff; and that if plaintiff's claims are sustained on the merits, then the rates now sought would be as unlawful as the rates now challenged.

Finally, Brother calls attention to the fact, undisputed by plaintiff, that the dumping margins determined by Commerce in the original Antidumping Duty Order were based upon exchange rates for the U.S. dollar and the Japanese yen that are no longer applicable.[7]

For the foregoing reasons, plaintiff's requested incidental relief is denied.

Summed up, then, the history of this complex litigation to date is as follows: On April 9, 1979 plaintiff filed a petition with the Treasury Department regarding PETs from Japan pursuant to the Antidumping Act of 1921, as amended (19 U.S.C. § 160, *et seq.*), and identified three Japanese manufacturers of PETs, including the parties-in-interest Brother and Silver. An Antidumping Proceeding Notice was published on May 18, 1979, and a Notice of Extension of the Investigatory Period was published on November 15, 1979. Thereafter a Withholding of Appraisement Notice was published on January 4, 1980. According to that notice, Treasury had made a tentative determination of less than fair value (LTFV) sales of PETs from Japan. On January 1, 1980, the Trade Agreements Act of 1979 had become effective. In accordance with section 102(b)(2) of that Act, Treasury's tentative determination under the Antidumping Act was treated as a preliminary determination under the new section 733(b) of the Tariff Act of 1930. Pursuant to section 735(a) of the Tariff Act, the administering authority (viz., Commerce) made a final determination, published on March 21, 1980, that PETs from Japan are being sold at LTFV. The Commission, in turn, instituted antidumping investigation No. 731–TA–12 (Final) pursuant to section 735 of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979, to determine whether an industry in the United States is materially injured or is threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of the LTFV imports from Japan. The Commission's Final Determination of Material Injury was published on May 7, 1980, and on May 9, 1980, Commerce published an Antidumping Duty Order respecting PETs from Japan, specifying *inter alia*, that deposits for estimated antidumping duties would be collected in the following amounts: Silver Seiko, 36.53 per cent ad valorem; and Brother Industries, 48.70 per cent ad valorem. In May 1980, Brother Industries and Silver Seiko requested that they be permitted to deposit bond or other security in lieu of estimated duties pursuant to section 736(c) of the Tariff Act of 1930. Having satisfied itself that it could make an early determination of the foreign market value and the United States price for the merchandise which was entered between January 4, 1980 and May 7, 1980, Commerce waived the deposit of estimated duty in lieu of security pending the early determination. On August 7, 1980, Commerce made its early determination of antidumping duties respecting PETs from Japan, which was published on August 13, 1980. In its early determination, Commerce specified the amount of the deposit of estimated anti-

---

**7.** The exchange rates applied in the original order related to the period of investigation into alleged sales at less than fair value, viz., November 1978 through April 1979.

dumping duties for future entries, viz., 14.-91 per cent ad valorem for Silver Seiko, and 5.3 per cent ad valorem for Brother Industries. Further, Commerce directed that Customs officials should assess antidumping duties equal to the amount determined during the proceeding for all entries of PETs manufactured by Brother Industries and Silver Seiko entered, or withdrawn from warehouse, for consumption on or after January 4, 1980 to May 7, 1980. On September 2, 1980, plaintiff filed a summons in this action contesting the determination of antidumping duty published on August 13, 1980 along with a complaint. The complaint, in substance, challenges various adjustments made by Commerce to the foreign market value of the typewriters. On September 12, 1980, plaintiff filed its application under section 516A(c)(2) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, to enjoin the liquidation of the entries that were the subject of Commerce's early determination of antidumping duties pending the disposition of the merits of the action and for specified incidental relief. As noted herein, the application for injunctive relief is granted; but plaintiff's application for incidental relief is denied.

Accordingly, it is hereby ORDERED:

1. That plaintiff's motion to enjoin the liquidation of entries of portable electric typewriters from Japan on and after January 4, 1980 to May 7, 1980, covered by the early determination of antidumping duties by the International Trade Administration, United States Department of Commerce, published in the *Federal Register* on August 13, 1980 (45 FR 53853–56) is granted.

2. That plaintiff's application for incidental relief is denied.

3. That the cross-motion to dismiss by Brother Industries, Ltd. and Brother International Corporation is denied.