**BROTHER INDUSTRIES, LTD., and Brother International Corporation, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Smith-Corona Group, Consumer Products Division, SCM Corporation, Party-in-Interest.**

**SMITH–CORONA GROUP, CONSUMER PRODUCTS DIVISION, SCM CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Brother Industries, Ltd., and Brother International Corporation;**

**Silver Seiko, Ltd., and Silver Reed America, Inc., Parties-in-Interest.**

**Consolidated Court No. 80–9–01436.**

United States Court of International Trade.

April 30, 1982.

Tanaka Walders & Ritger, Washington, D. C. (H. William Tanaka, Lawrence Walders, Donald L. E. Ritger and Wesley K. Caine, Washington, D. C., of counsel), for Brother Industries, Ltd. and Brother Intern. Corp.

Eugene L. Stewart, Terence P. Stewart, Washington, D. C., Edwin M. Silverstone

and Michael M. Maloney, New York City, for Smith-Corona Group, Consumer Products Div., SCM Corp.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Director, Commercial Litigation Branch, Velta A. Melnbrencis, New York City, and Francis J. Sailer, Washington, D. C., of counsel), James M. Lyons, Staff Atty., Intern. Trade Administration, Dept. of Commerce, Washington, D. C., for defendant.

Arter, Hadden & Hemmendinger, Washington, D. C. (Noel Hemmendinger, William Barringer and Christopher Dunn, Washington, D. C., of counsel), for Silver Reed America, Inc. and Silver Seiko, Ltd.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT.

NEWMAN, Judge:

We are faced in this consolidated action with a number of highly complex issues which are of novel impression, and undoubtedly are of great significance in the administration of the nation's antidumping laws. The above-captioned cases arose out of the same determination by the Department of Commerce, thus are largely interrelated and consequently—for the sake of expedition—were consolidated by this Court for review.

### I.

### BACKGROUND

Smith-Corona Group, Consumer Products Division, SCM Corporation ("SCM"), and

the related companies of Brother Industries, Ltd., of Nagoya, Japan and Brother International Corporation, of Piscataway, New Jersey (collectively "Brother"),[1] challenge the "Early Determination of Antidumping Duties" by the International Trade Administration, United States Department of Commerce ("Commerce") in *Portable Electric Typewriters from Japan; Determination of Duty*, published in the *Federal Register* on August 13, 1980,[2] 45 FR 53853–56, as clarified and corrected in 46 FR 14006 (1980).

SCM is the sole domestic manufacturer of portable electric typewriters ("PETs"). Brother Industries, Ltd. is a Japanese manufacturer of PETs and Brother International Corporation is an importer of such merchandise from Japan. Silver Seiko, Ltd. and Silver Reed America, Inc. (collectively "Silver") have intervened in these proceedings. The former is a Japanese manufacturer of PETs, and the latter is an importer of such merchandise from Japan.

At a previous stage of this litigation, SCM made application under section 516A(c)(2) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (19 U.S.C. § 1516a(c)(2)), to enjoin the liquidation of the entries that were the subject of Commerce's early determination of antidumping duties pending the final hearing and disposition on the merits of the action, and additionally, for certain incidental relief. Brother filed a cross-motion to

---

1. SCM filed the summons in Court No. 80–9–01343 and Brother filed the summons in Court No. 80-9-01436. SCM intervened as a party-in-interest in Brother's case; Brother and Silver Seiko, Ltd. and Silver-Reed America, Inc., in turn, intervened in Court No. 80–9–01343. Subsequently, by an order of this Court entered on December 30, 1980, the two actions were consolidated pursuant to a motion filed by Brother; and a motion to sever by intervenors Silver Seiko, Ltd. and Silver Reed America, Inc. was denied. See 1 CIT—, Slip Op. 80–18 (1980).

2. This determination was made pursuant to section 736(c) of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979, 19 U.S.C. § 1673e(c). See my decision in 1 CIT—,

Slip Op. 80–17, 507 F.Supp. 1015 (1980) for the background of the "Early Determination of Antidumping Duties" by Commerce; and the memorandum and order granting SCM's application for injunctive relief, while denying Brother's cross-motion to dismiss for lack of subject matter jurisdiction. See also *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest)*, 84 Cust.Ct. 227, C.R.D. 80–2, 487 F.Supp. 96 (1980) and *F.W. Myers & Co., Inc., et al. v. United States*, 72 Cust.Ct. 219, 220–21, C.D. 4544, 376 F.Supp. 860 (1974), for excellent summaries of the Antidumping Act and its administration by Chief Judge Re and Judge Maletz respectively.

dismiss for lack of subject matter jurisdiction, which cross-motion was opposed by SCM and the Government. Silver does not challenge the Court's jurisdiction. In 1 CIT —, Slip Op. 80–17, 507 F.Supp. 1015 (December 30, 1980), this Court entered a memorandum and order: (1) granting SCM's motion for injunctive relief (thus, staying the liquidation of entries of PETs on and after January 4, 1980 to May 7, 1980, covered by the early determination of antidumping duties); (2) denying SCM's application for incidental relief; and (3) denying Brother's cross-motion to dismiss for lack of jurisdiction. The prior history of this case is summarized in my prior decision of December 30, 1980, and in the interest of brevity that background will be reiterated herein only to the extent necessary for discussion of the issues presently before the Court.[3]

In its early determination of antidumping duties, Commerce granted Brother and Silver a wide range of adjustments or deductions in determining the foreign market value of their PETs sold in Japan in the four-month period investigated that resulted in findings of various weighted average dumping margins.[4] The gravamen of SCM's action is that certain of these adjustments or deductions are contrary to law and unsupported by substantial evidence in the administrative record.

Specifically, the adjustments to foreign market value made by Commerce which are challenged by SCM are:

(1) Adjustment of the foreign market value of each typewriter model for differences in packing costs and in Japanese inland freight incurred in sales in the home market and to the United States.

(2) Adjustment of the foreign market value of each typewriter model by the amount of certain types of rebates in connection with sales in Japan.

(3) Adjustment of the foreign market value of each typewriter model pursuant to 19 CFR § 353.15(c), for the exporter's sales price offset ("ESP offset"), in those instances where foreign market value was compared with the exporter's sales price.

(4) Adjustment of the foreign market value of each Brother typewriter model for differences in physical characteristics by an amount that was equal to the difference in the costs of certain accessories and printed materials provided in connection with sales in Japan and to the United States.

(5) Adjustment to the foreign market value of each typewriter model by an amount for certain advertising expenses incurred in sales in Japan.

As is evident from the above, SCM has mounted a broad and multifaceted challenge to Commerce's early determination of antidumping duties.[5]

Brother's action contests the denial by Commerce of an additional adjustment to foreign market value for the cost of a promotional campaign conducted in Japan,

3. On October 14, 1980, oral argument was heard on SCM's requested injunctive and incidental relief, and Brother's cross-motion to dismiss. On March 4, 1982, oral argument was heard concerning the merits in this consolidated case pursuant to SCM's request.

4. The PETs covered by the early determination of antidumping duties were entered or withdrawn from warehouse for consumption on or after January 4, 1980 to May 7, 1980. January 4, 1980 was the date of publication by the Treasury Department of its tentative determination of sales at less than fair value, and the date on which liquidation was suspended (44 FR 1220); May 7, 1980 was the date of publication by the International Trade Commission of its affirmative final injury determination (45 FR

30188). On January 2, 1980, Treasury's responsibility for the administration of the antidumping law was transferred to the Commerce Department by the President's Reorganization Plan No. 3 of 1979 (44 FR 69275 and 45 FR 9931).

5. SCM also challenges an alleged determination by Commerce granting Silver an adjustment for differences in merchandise for costs associated with the changeover of production lines. However, in light of the statements of defendant and of Silver that in fact no adjustment was granted to Silver for production changeover costs, SCM "does not at the present time further pursue this issue" (SCM's Brief, at 156).

namely the give-away of transistor radios in connection with the sale of portable typewriters (including PETs). Brother contends that the disallowance was arbitrary and capricious or otherwise not in accordance with law.[6] In all other respects, Brother supports the adjustments made by Commerce and challenged by SCM.

Presently before the Court are SCM's motion for summary judgment and cross-motions for summary judgment by the Government, Brother and Silver. Silver takes no position on that aspect of Commerce's determination challenged by Brother.

## II.

### "CAUSAL LINK" ISSUE

We first consider SCM's argument that Commerce erred as a matter of law in granting the contested adjustments to foreign market value because no "causal link" was established between the differences in circumstances of sale and the differential between United States price and the foreign market value, as required by 19 U.S.C. § 1677b(a)(4). In this connection, SCM argues that the Court must hold invalid the administering authority's regulation 19 CFR § 353.15(d) as being inconsistent with and in violation of the antidumping law. The "causal link" issue is the centerpiece of SCM's challenge to all of the contested adjustments.

SCM complains that Commerce in its early determination of antidumping duties made no finding of a causal link between the differences in circumstances of sale and the difference in the United States price and the foreign market value. Further, SCM contends that no information concerning a causal link was submitted by Brother or Silver to Commerce, nor was any such information requested by the administering authority.

■ The "causal link" issue presented by SCM arises from 19 U.S.C. § 1677b(a)(4), which so far as pertinent, reads:

(4) Other adjustments.—In determining foreign market value, *if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value* (or that the fact that the United States price is the same as the foreign market value) *is wholly or partly due to —*

(A) the fact that the wholesale quantities, in which such or similar merchandise is sold or, in the absence of sales, offered for sale, for exportation to, or in the principal markets of, the United States, as appropriate, in the ordinary course of trade, are less or are greater than the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale, in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold for home consumption, then for exportation to countries other than the United States);

(B) *other differences in circumstances of sales ;* or

(C) the fact that merchandise described in paragraph (B) or (C) of section 1677(16) of this title is used in determining foreign market value.

*then due allowance shall be made therefor.* [Emphasis added.]

From a reading of the statute, it is clear that the party claiming entitlement to an adjustment of foreign market value must prove: (1) the existence of "other differences in circumstances of sales" within the meaning of the statute; (2) that the difference in United States price and foreign market value is wholly or partly *due to* other differences in circumstances of sale; and (3) the monetary value of the differences for which adjustments are claimed.

---

**6.** Brother's complaint also alleged that Commerce erred by including a certain typewriter (Brother Model No. 7800, ball-type typewriter) within the scope of the early determination. However, Brother has abandoned that claim.

Focusing on the second requirement above, and particularly the language "due to" (denominated by SCM as the "causal link" requirement), it must be stressed that the statute requires only that a causal link be established to the *satisfaction of the administering authority.* But the statute provides no standards or guidelines as to how the administering authority is to determine whether the price differential is wholly or partly "due to" other circumstances of sale. Manifestly, then, since the statute sets forth no definitive criterion, Congress intended to rely upon the expertise and judgment of the administering authority to determine the criterion which will establish the existence of the necessary causal link between the difference in prices and differences in circumstances of sale. In granting adjustments to the foreign market value of the Brother and Silver typewriters, the administering authority was presumptively satisfied from the evidence submitted that the requisite causal link between the differentials in price and the differences in circumstances of sale existed in this case.

While 19 U.S.C. § 1677b(a)(4) does not define "other differences in circumstances of sales" or prescribe the method for determining allowances, 19 CFR § 353.15 has been promulgated for that purpose. That regulation reads:

§ 353.15 Differences in circumstances of sale.

(a) *In general.* In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

(b) *Examples.* Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances also generally will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser.

(c) *Special rule.* Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section, reasonable allowances for other selling expenses generally will be made in cases where a reasonable allowance is made for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, the amount of such allowance being limited to the actual other selling expenses incurred in the one market, or the total amount of the commission allowed in such other market, whichever is less. In making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market.

(d) *Determination of allowances.* In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the cost of such differences to the seller, but, where appropriate, he may also consider the effect of such differences upon the market value of the merchandise.

It is evident that section 353.15(d) assumes a causal link exists between differences in circumstances of sale and price differentials primarily where there are cost

differences to the seller or, where appropriate, the differences in circumstances of sale have an effect upon the market value of the merchandise. In quantifying the reasonable allowances for any differences in circumstances of sale, the regulation specifies an administrative preference for considering the cost of such differences to the seller, "but where appropriate [the administrating authority] may also consider the effect of such differences upon the market value of the merchandise". Stated differently, section 353.15(d) provides, in effect, that if there are differences in circumstances of sale, and if there is also a price differential, then the administering authority will be satisfied that there is a causal connection between those events upon a showing either that the costs to the seller are different, or under appropriate circumstances, that the differences in circumstances of sale have an effect upon the market value of the merchandise.

■ SCM insists that 19 CFR § 353.15(d) is inconsistent with and in violation of 19 U.S.C. § 1677b(a)(4) because it permits the administering authority, when determining the amount of the reasonable allowance for differences in circumstances of sale, to "be guided primarily by the cost of such differences to the seller". Continuing, SCM maintains that the regulation's cost criterion is invalid, and that the only correct standard under the statute is the effect, if any, of differences in circumstances of sale upon the market value of the merchandise. Consequently, according to SCM, the regulation unlawfully eliminates the statutory requirement that a "causal link" be established between the selling price differential and the claimed differences in circumstances of sale. SCM also argues that the regulation is invalid because the statute is concerned with factors affecting selling prices, not with the differences in cost to the producer.

I must disagree with SCM's contention that regulation 19 CFR § 353.15(d) is violative of the statute:

First, regulation 19 CFR § 353.15(a) requires that it be established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to bona fide differences in the circumstances of the sales compared. Hence, while 353.15(a) sets forth the statutorily mandated causal link, it leaves open the *circumstances* in which the Secretary will be satisfied as to the existence of the causal link. Indeed, regulation 353.15(d) indicates that the Secretary will be satisfied that the price differential is wholly or partly due to differences in circumstances of sale upon a showing that there is a cost difference to the seller for the different circumstances of sale, with the amount of the allowance to be based upon the cost of such differences. It is stressed, however, that the regulation expressly permits the administering authority to also consider, when appropriate, the effect that differences in circumstances of sale may have upon market value of the merchandise.

But in determining the validity of regulation 353.15(d), it must be emphasized that under the *statute* whether a price differential is due to differences in circumstances of sale need only be established *to satisfaction of the administering authority.* Manifestly, the statutory language "to the satisfaction of the administering authority" confers upon Commerce wide discretion in determining the existence of a "causal link". And plainly, the statute does not limit the administering authority to determining the effect of differences in circumstances of sale on market values, as urged by SCM. If the administering authority is satisfied that adjustments should be made to the foreign market values predicated upon differences in relative costs, as provided in the regulation, then that approach is well within the discretion granted by the statute, unless there is no rational connection between costs and prices.

■ Fundamentally, the regulation in question can be set aside by the Court only if the agency exceeded its statutory author-

ity or the regulation is unreasonable. *United States v. Gruen Watch Co.*, 21 C.C.P.A. 225, T.D. 46761 (1933); *Alberta Gas Chemicals, Inc. v. United States*, 1 CIT 312, 515 F.Supp. 780 (1981). When the regulation is related to the purposes of the enabling legislation—as the case here—its validity should be sustained. *Cf. Kyle v. I.C.C.*, 609 F.2d 540, 542–43 (D.C.Cir.1980).

Aside from suggesting the possibility that factors other than a difference in costs for sales in the home market versus sales for export to the United States may account for a difference in selling prices, SCM cites no authority for its contention that the costs bear no rational relationship to the selling prices of merchandise. Silver, on the other hand, aptly points out that "[t]he relationship of cost to the determination of fair market value is an integral part of the statutory scheme of the antidumping law". Thus, where a foreign market value cannot be determined on the basis of prices of such or similar merchandise sold in the principal markets of the foreign country, the administering authority can determine such value under § 773(a)(2) of the Act (19 U.S.C. § 1677b(a)(2)) by use of "constructed value". As defined by § 773(e) of the Act (19 U.S.C. § 1677b(e)), constructed value is a cost-oriented method of valuation. Congressional recognition of the relationship between fair value and cost is also underscored by § 773(b) (19 U.S.C. § 1677b(2)), which requires the administering authority to disregard prices as the basis of foreign market value where those prices do not "permit the recovery of all costs within a reasonable period of time." The inclusion of these provisions in the law is undoubtedly recognition by Congress that there exists a direct relationship between cost and foreign market value as defined by the statute.

In the final analysis, one need not be an economist to recognize that under normal market conditions prices directly reflect costs.

Further, bearing upon the issue concerning the validity of 19 CFR § 353.15(d) is the fact that the regulation was promulgated in 1976 following what the Treasury Department regarded as its long-standing practice in the administration of the law. See paragraph 3, preamble to T.D. 76–176 (1976), 41 FR 26203 (1976). As stated in the notice:

> 3. Para. (d) of § 153.10 has been changed to provide that in determining allowances for differences in circumstances of sale, the Secretary will be guided primarily by the cost of such differences to the seller but, where appropriate, may also consider the effect of such differences upon the market value of the merchandise. * * * *These changes are intended to reflect long existing Treasury practice.* [Emphasis added.]

The administrative practice of permitting allowances for differences in circumstances of sale based upon the cost of such differences to the seller is a long-standing practice dating back to the 1960 Treasury Department antidumping regulations. When in 1958, Congress amended § 202 of the Antidumping Act of 1921 to include provisions for adjustments for "other differences in circumstances of sale", the Treasury Department promulgated its first regulations to administer the differences in circumstances of sale adjustment permitted by statute. Section 14.7(b)(2)(iii) of those regulations provided in pertinent part:

> (iii) In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the effect of such differences upon the market value of the merchandise but, where appropriate, *may also consider the cost of such differences to the seller, as contributing to an estimate of market value.* (Emphasis added.)

Hence, contemporaneously with the enactment of the amendment to § 202 of the Antidumping Act of 1921 permitting adjustments for "other differences in circumstances of sales," the Treasury, while guided "primarily" by a market value approach, was authorized to, and in fact adopted, the

practice of "also" considering the cost of the differences to the seller. The importance of such a contemporaneous interpretation of the statute is pointed up in *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1977), where the Supreme Court said:

Moreover, an administrative "practice has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315 [53 S.Ct. 350, 358, 77 L.Ed. 796] (1933); *see, e.g., Power Reactor Co. v. Electricians*, 367 U.S. 396, 408 [81 S.Ct. 1529, 1535, 6 L.Ed.2d 924] (1961).

■ Moreover, as a familiar matter of well-established principles of administrative law, a long-standing construction of a statute by an agency charged with its administration is afforded great weight by a reviewing court. *See, e.g., Zenith Radio Corporation v. United States, supra; Saxbe, Attorney General, et al. v. Bustos, et al.*, 419 U.S. 65, 74, 95 S.Ct. 272, 279, 42 L.Ed.2d 231 (1974); and *National Labor Relations Board v. Bell Aerospace Company, Division of Textron, Inc.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). This is especially true where, as here, Congress has re-enacted the statute without change, in the face of the long-standing practice. *Id.* Significantly, Congress enacted antidumping legislation in both 1975 and 1980, and on neither occasion did Congress in any way express disapproval of the practice in question, or on the latter occasion, the 1976 regulation itself.[7] When Congress thoroughly reviewed the United States antidumping legislation prior to enacting the

Trade Agreements Act of 1979, it expressed specifically how it was departing from the substance of the prior law, as it related to the understanding of "foreign market value." Accordingly, from the legislative history, it is obvious that the only changes Congress intended in connection with the understanding of "foreign market value" were ones which would put "third country price" and "constructed value" on an equal footing in terms of priority; would permit the use of averaging and sampling techniques in price calculations; and would give Commerce authority to disregard insignificant adjustments. In all other respects, Congress expressly intended to "retain existing law" concerning the term "foreign market value".[8] *See* S.Rep.No.96–249, 96th Cong., 1st Sess. 95 (1979), U.S.Code Cong. & Admin.News 1979, p. 381.

Indeed, as if to reinforce its manifest intent, the *Senate Report, supra,* states:

*Reasons for the provision.*—Subtitle B of title VII of the Tariff Act, as added by section 101 of the bill, contains a comprehensive antidumping law. Many of the substantive rules of the Antidumping Act are reenacted in subtitle B. *The Committee does not intend to change the substantive rules except as specifically noted in this report.* Changes in organization and terminology have been made solely to modernize and clarify the terms of those rules. *Therefore, although the Antidumping Act, 1921, is replaced by subtitle B, the committee intends the administrative and judicial precedents relating to the terms under the Antidumping Act to continue to apply under the new law.* [Emphasis added.]

In connection with the above, it is significant that Congress was well aware of the 1976 regulation explicitly authorizing quantification of adjustments for differences in

---

**7.** Congress enacted antidumping provisions in the Trade Act of 1974, Pub.L. 93–618, and the Trade Agreements Act of 1979, Pub.L. 96–39.

**8.** Thus, the Senate Committee on Finance stated:

*The bill*—Section 773 of the Tariff Act of 1930, as added by section 101 of the bill [*i.e.,* the provision defining "foreign market value"], *would retain existing law with several modifications.* [Emphasis added.]

circumstances of sale on the basis of the cost to the seller when it enacted the Trade Agreements Act. In early 1979, the United States General Accounting Office ("G.A. O.") extensively studied the antidumping legislation and reported its findings to the Congress. *See* U.S. General Accounting Office, *U.S. Administration Of The Antidumping Act Of 1921; Report To The Congress By The Comptroller General Of The United States*, ID–79–15 (March 15, 1979). With specific reference to the practice now challenged by SCM, the G.A.O. reported and explained (*id.*, at 27):

> Adjustments for circumstances of sale are quantified on the basis of the cost to the seller. Although Customs regulations provide that, where appropriate, the effect of these differences on the market value of the merchandise will be considered, officials explained that this is rarely practical because all merchandise is uniformly affected by circumstances of sale and it normally is not possible to isolate the effects on market value of each of these items.[9]

It clearly appears, then, that Congress knowingly declined to overturn the existing regulations or otherwise disapprove the practice in question when it extensively reviewed the antidumping laws.[10] Nevertheless, SCM strenuously argues against the foregoing conclusion by pointing to the following language in *S.Rep.No.96–249, supra*, at 96, U.S.Code Cong. & Admin.News 1979, p. 482:

> This report is not intended as a general expression of approval or disapproval of current regulations or administrative practice. This should be emphasized with respect to regulations regarding the current law on dumping from non-market economies countries. The reenactment of current statutory provisions on this subject is not an expression of Congressional approval or disapproval of the regulations promulgated by the Secretary of the Treasury on August 9, 1978 (43 FR 35262).

Several points are relevant in connection with the foregoing statement. First, the Senate Finance Committee did not disapprove the current regulations and administrative practice, but in effect preserved the status quo, a status quo that other passages of the same Senate Report indicate that Congress was intent upon preserving, with "several modifications". Treating similar language in legislative history relating to the Trade Act of 1974, the Court of Customs and Patent Appeals reasoned in *United States v. Zenith Radio Corporation*, 64 C.C.P.A. 130, 145, C.A.D. 1195, 562 F.2d 1209 (1977), *aff'd*, *Zenith Radio Corporation v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978):

> The effect of the Committees' mutually contradictory approve-disapprove state-

9. In fact, Congress was made aware of this practice before it enacted the original provision for circumstances-of-sale adjustments in the 1958 amendment to the Antidumping Act, 1921, in Pub.L. 85–630, 72 Stat. 583. In testimony quoted by SCM at 71 of its memorandum, Assistant Secretary of the Treasury David W. Kendall explained to Congress how circumstances-of-sale adjustments were made under the then-existing antidumping regulations, and gave an example of an adjustment for a certain service guarantee provided by the manufacturer for bicycles sold for home consumption, but not for bicycles exported to the United States. The adjustment was computed exclusively on the basis of the cost to the manufacturer. *See Hearings on H.R. 6006, 6007, and 5120 Before the House Comm. on Ways and Means*, 85th Cong., 1st Sess. 39 (1957).

10. SCM's quotation from a "Treasury Department Memorandum Relating to the Antidumping Act, 1921", at 38 (August 1961) for the rationale of using "price" as a measure of value, rather than seller's costs, is taken out of context. The excerpt quoted specifically relates to the allowance of quantity discounts, not to other differences in circumstances of sale or differences in physical characteristics. The terms "price" and "market value" are not necessarily synonymous. Moreover, the fact that using prices in determining adjustments for differences in wholesale quantities may be convenient does not support SCM's argument that it is more efficient to quantify differences in circumstances of sale on the basis of market value than on the basis of cost.

ments is necessarily to leave untouched the status quo with respect to the administrative practice on countervailing duties. Finding no guidance in what the committees said, we look to what the Congress did. [Footnote omitted.]

And as noted by the Supreme Court in *Zenith Radio Corp.*, "whether or not Congress can be said to have 'acquiesced' in the administrative practice, it certainly has not acted to change it."

Second, a careful reading of the passage in question seems to indicate that the chief concern of Congress was regulations relating to non-market economies. The regulations specifically referred to in the passage, *i.e.*, those promulgated on August 9, 1978, dealt with non-market economies. *See* 43 FR 35262 (1978).

Another important consideration bearing upon the validity of 19 CFR § 353.15(d) is whether the regulation is reasonably related to the purpose of the circumstances of sale adjustment.[11] That purpose was enunciated in the legislative history of the 1958 amendment to the Antidumping Act, 1921 (predecessor to the current antidumping provisions), wherein the circumstances of sale provision was initially made a part of the scheme of the antidumping legislation, *i.e.*, Pub.L. 85–630. There, *H.Rep.No.1261, 85th Cong., 1st Sess. 7 (1957)* stated:

Differences due to "other circumstances of sale".

Under the bill as reported, provision is made (sec. 202(b)(2) and (c)(2)) for consideration of "other differences in circumstances of sale" in addition to quantity differentials. *This is designed to facilitate efficient and fair comparison between foreign market value and price to the United States market.* [Emphasis added.]

It is self-evident that without adjustments for differences in circumstances of

sale, price comparisons would be essentially distorted and the objective of fairness would be defeated. And it is evident to this Court that the cost approach used to quantify adjustments for differences in circumstances of sale authorized by 19 CFR § 353.15(d) is consistent with the purpose of the circumstances of sale adjustment, as enunciated in the House Report, *supra*. Indeed, for all practical purposes, the cost approach in most instances is the only efficient means of administering the circumstances of sale adjustment, considering that foreign market value and United States price must under the antidumping law be determined within very strict limits of time, *viz.*, 90 days in the instant proceeding. *See* 19 U.S.C. § 1673e(c)(1).

In direct contrast to the primary cost approach provided in 19 CFR § 353.15(d), the alternative market value methodology prescribed by the regulation is much more difficult, and in many instances impossible, to administer fairly and efficiently. To require Commerce to analyze the effects on market value of every difference in circumstances of sale would be to require a highly complex quantification process involving a multitude of economic factors, *including a cost analysis*, and to do so within strict time limits. I have no doubt that if the market value approach were the sole (or even the primary) method utilized for quantifying adjustments for differences in circumstances of sale, as a practical matter the resulting adjustments in many instances would be purely speculative or sheer guesswork.

The present regulation, in any case, does contemplate the possibility of situations where a specific difference in circumstances of sale may bear no perceived market value (or a market value more or less than cost) in either the United States market or in the home market, since the regulation expressly provides that "where appropriate [the administering authority] may also consider

---

11. *Cf. Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36

L.Ed.2d 318 (1973).

the effect of such differences upon the market value of the merchandise". Consequently, the regulation, while it gives primary emphasis to cost differentials, does not preclude a market value analysis in appropriate instances.

In support of its argument that the current regulation does not in fact represent a long-continued administrative practice, SCM attributes much significance to the fact that in 1960 the antidumping regulations (19 CFR § 14.7(b)(2) (1960)) concerning adjustments for differences in circumstances of sale pursuant to § 202 of the Antidumping Act of 1921 provided that "the Secretary will be guided primarily by the effect of such differences upon the market value of the merchandise * * * ".

Predicated upon this predecessor regulation, SCM challenges the statement of the Treasury published in T.D. 76–176 (1976), *supra*, that the 1976 regulation reflected long-standing practice on the part of that agency. Several observations are pertinent in this connection.

First, although regulation 14.7(b)(2)(iii) provided that the primary approach would be grounded on market value, the 1960 regulation by its terms expressly permitted consideration of the costs to the seller "where appropriate".

Second, since the 1976 statement by Treasury was an official published statement as to that agency's prior practice, it must be presumed that Treasury found it consistently "appropriate" to make adjustments by reference to costs. However, SCM has failed to show an administrative practice in conflict with the Treasury statement.

Finally, although the primary approach prescribed under regulation 14.7(b)(2)(iii) was market value, there is no doubt that Treasury's experience over a period of many years with the circumstances of sale adjustment indicated the necessity for primarily utilizing a cost rather than market value approach. But the cost approach prescribed in 19 CFR § 353.15(d) was not a revolutionary or abrupt change in methodology, as implied by SCM, inasmuch as under the prior regulation the seller's costs could be, and in fact were, considered.

In sum, the adjustments made by Commerce in the present case under 19 CFR § 353.15(d) were made pursuant to a valid regulation.

█ Since there is no merit in SCM's contention that Commerce could look only to the effect on market value in making adjustments for differences in circumstances of sale, its contention that the various adjustments in question are not supported by substantial evidence must also fail. Such contention was predicated upon the fact the record did not reflect that Commerce had requested, or that Brother and Silver had supplied, information demonstrating the effect of the claimed adjustments on market values. Nonetheless, the record shows that Brother and Silver submitted voluminous documentation in support of their asserted adjustments to foreign market value on the basis of costs. Since Commerce, pursuant to its own regulation, properly looked to sellers' costs, it certainly had sufficient reason to be satisfied that the differences in circumstances of sale for which allowances or adjustments were in fact made, accounted in whole or in part, for the amount of the difference between the United States price and the foreign market value. Hence, the adjustments are supported by substantial evidence in the record.

### III.

### ESP OFFSET

In determining foreign market value, Commerce allowed certain adjustments to the home market selling prices of the Brother and Silver typewriters as "other differences in circumstances of sale" in accordance with its "Special Rule" set forth in 19 CFR § 353.15(c), which provides for the so-called exporter's sales price offset ("ESP

offset").[12] *See* 45 FR 53855. Section 353.-15(c) provides:

(c) *Special rule.* Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section, reasonable allowances for other selling expenses generally will be made in cases where a reasonable allowance is made for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, the amount of such allowance being limited to the actual other selling expenses incurred in the one market, or the total amount of the commission allowed in such other market, whichever is less. *In making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market.* [Emphasis added.]

Following the authority of the last sentence of paragraph (c) (the so-called "exporter's sales price offset" or "ESP offset") Commerce adjusted the foreign market value of Silver's PETs for various advertising expenses incurred in Japan up to the amount of the selling expenses incurred in the United States, and of Brother's PETs for certain home market selling expenses (payroll and payroll-related expenses, depreciation, other operating expenses, indirect advertising and promotional premiums). The ESP offset adjustments were made on the basis of evidence of the various *costs* involved.

■ SCM urges that the special rule is contrary to law because: (1) the adjustments are not directly related to the sales under consideration, which is allegedly required by legislative history as well as by judicial construction in *F.W. Myers & Co., Inc. v. United States*, 72 Cust.Ct. 219, 376 F.Supp. 860 (1974); (2) the adjustments are unilateral in nature (viz., the adjustments are not made by comparing similar expenses incurred by the foreign producer on its export sales in violation of the statutory language in Section 773(a)(4)(B), which permits adjustment for "differences in circumstances of sales"); and (3) the adjustment is not available equally in "purchase price" and "exporter's sales price" transactions. Additionally, SCM contends that the determination is not supported by substantial evidence because the record is devoid of any information which would demonstrate that the claimed differences in circumstances of sale are directly related to the sales under consideration or that the claimed differences account in whole or in part for the pricing differentials.

I find that SCM's contentions have no merit because the special rule is in conformity with the entire statutory scheme, constitutes a valid exercise of the statutory discretion granted in Section 773(a)(4), is neither precluded by legislative history nor by *F.W. Myers*, and represents a long existing administrative practice.

Under the antidumping statute, duties are imposed in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise, which latter term means "purchase price" or the "exporter's sales price" of the merchandise, whichever is appropriate. Sections 731 and 772(a) of the Tariff Act of 1930, as amended, 19 U.S.C. 1673 and 1677a(a). "Exporter's sales price," in turn, is defined in the first part of section 772(c) of the Act, 19 U.S.C. 1677a(c) as "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter * * *." If the definition had stopped there, then in comparing foreign market value with the exporter's sales price, no adjustment to either the foreign market value or the exporter's sales

---

**12.** The largest adjustment for the Silver typewriters and one of the largest adjustments for many of the Brother typewriters is the ESP offset.

price would have been necessary because Congress would have expressed its intent that there be a comparison between the price in the home market and the price in the United States. However, Congress went further, and in the very same sentence of section 772(c) provided:

as adjusted under subsections (d) and (e) of this section

Subsection (e) of section 772(c), 19 U.S.C. 1677a(e), of course, specifically provides that the exporter's sales price must be adjusted by being reduced by the amount, if any, of:

(1) commissions for selling in the United States the particular merchandise under consideration,

(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, and

(3) any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

▬ By stripping all of the selling expenses incurred in the United States from the exporter's sales price, Congress made it plain that it did not want a comparison between a price in the home market and a price in the United States market (which prices would then properly reflect all selling expenses incurred), but rather between a price in the home market and a price for export to the United States. Accordingly, then, the intent of the exporter's sales price adjustment is to permit an estimation of the "true" *f.o.b.* foreign port price for the merchandise under considera-

tion in an arms-length transaction regarding an importation made by a party related to the exporter.[13] The explanation in Senate Finance Committee Report No. 1619 at 10, makes it clear that the 1958 amendment to the Antidumping Act, which first added the provision for other differences in circumstances of sale, was "designed to facilitate efficient and fair comparison between foreign market value and price to the United States market". Obviously, it would have been unfair to continue comparing an unadjusted foreign market value with an adjusted exporter's sales price from which all selling costs have been deducted in circumstances where the foreign market value represented a price higher because of inclusion of the manufacturer's selling costs in the home market.

In 1976, Treasury amended the Customs regulations and acknowledged its long-existing practice to permit the ESP offset. *See* paragraph 2, preamble to T.D. 76–176, *supra.* Interestingly, Congress took no steps concerning the Trade Agreements Act of 1979 to eliminate this long-established administrative practice, as codified in the 1976 regulation, while reenacting without change the statutory circumstances of sale provision.

Importantly, just prior to the enactment of the Trade Agreements Act, the attention of Congress was specifically drawn to the provision for the ESP offset as a "circumstances of sale" allowance.[14] Thus, in the report prepared by the G.A.O., *supra*, the Congress was specifically advised as follows (G.A.O., *U.S. Administration Of The Antidumping Act Of 1921, supra*, at 24):

*Circumstances of sale*

Fair value comparisons are further complicated by disagreements over the

---

13. The rationale for the adjustment for commission and selling expenses was described in the Senate Finance Committee Report No. 16, 67th Cong., 1st Sess. at 12 (1921) as follows:

In substance, the term "exporter's sales price" is defined in such manner as to make the price the net amount returned to the foreign exporter.

14. It is also significant that at the time Congress was considering the Trade Agreements Act, the offset provision was contained in a 1976 regulation entitled "Differences in circumstances of sale" (19 CFR § 353.15).

identification and treatment of allowances arising from differences in commercial practices. * * * *In particular, controversy has developed over two aspects of Treasury regulations, which provide that—*

\* \* \* \* \* \*

—"in making comparisons using exporter's sales price, reasonable allowance will be made for actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States" [Emphasis added.]

Thus, Congress was fully aware of the controversial ESP offset and declined to change it in anyway. As noted, *supra,* in enacting the Trade Agreements Act, Congress meticulously identified the instances where it was making changes in the law relating to foreign market value. There is not the slightest suggestion in the legislative history that the long-continued ESP offset practice was to be affected by the new legislation. On the contrary, the Senate Report No. 96–249, at 106, U.S.Code Cong. & Admin.News 1979, p. 493, states:

The Committee does not intend to change the substantive rules except as specifically noted in this Report * * * therefore, although the Antidumping Act, 1921, is replaced by Subtitle B, the Committee intends the *administrative* and judicial *precedents* relating to the terms under the Antidumping Act to continue to apply under the new law.

and at p. 96, U.S.Code Cong. & Admin.News 1979, p. 482:

* * * Section 773 of the Tariff Act of 1930, as added by section 101 of the bill, would generally retain existing law as it relates to the use and *calculation of foreign market value* * * * [Emphasis added.]

█ In sum, I see nothing in the legislative history cited by the parties that contravenes the validity of the ESP offset; and as previously noted herein, inasmuch as the current Commerce regulation reflects a long-standing administrative practice, acquiesced in by Congress, such practice is

entitled to great deference. *Zenith Radio Corp. v. United States, supra.*

To support its contention that the ESP offset is not permissible as an adjustment for differences in circumstances of sale, SCM heavily relies upon the *F.W. Myers* holding. That case, however, is factually and legally distinguishable from the present case. In short, *F.W. Myers* involved purchase price, not exporter's sales price, transactions, and therefore the Court was not presented with the issue of the validity or application of the ESP offset in determining foreign market value. Moreover, *F.W. Myers* ultimately turned upon the plaintiffs' failure to substantiate the amounts of their claimed adjustments for differences in circumstances of sale.

Another vital aspect of Congressional intent respecting the ESP offset, briefly mentioned above, is the fact that the regulation effectuates the purpose of the circumstances of sale provision, which is "designed to facilitate efficient and fair comparison between foreign market value and price to the United States market." *H.Rep.No. 1261, supra,* at 7. Specifically, the purpose of the exporter's sales price offset is to permit a fair price comparison in related party transactions where a deduction is made pursuant to 19 U.S.C. § 1677a(e) for selling expenses generally incurred by the related importer in selling the merchandise in the United States, including items of general administrative and overhead expense that are not directly related to the sales involved. The calculation of dumping margins would be severely distorted if no offsetting adjustments were permitted in the calculation of foreign market value. In point of fact, a margin could be found simply because the foreign market value in question reflected the selling cost in the home market which the producer was absorbing. This unfairness is eliminated, in part, by the ESP offset since it prevents the imposition of antidumping duties solely as a result of the selling expenses incurred by the manufacturer in the home market. Since, as noted above, the circumstances of sale provision was intended by Congress to

facilitate fair comparison between foreign market value and price to the United States market, and since the ESP offset is designed to effectuate that intent, SCM's argument that the ESP offset violates Congressional intent is completely without merit.[15]

I have carefully considered SCM's contentions that Commerce's "Special rule" providing for the ESP offset is invalid because: (1) the rule allows adjustments that are not directly related to the sales under consideration; (2) the rule allows "unilateral" adjustments for home market selling expenses that are not compared with similar expenses incurred by the foreign producer in its export sales, and thus permits allowances that are not adjustments for "other *differences* in circumstances of sale" (emphasis by SCM); and (3) the rule permits adjustments that are not available equally in "purchase price" and "exporter's sales price" transactions.

▪▪ With reference to point (1), I see nothing in the language of the statute or its legislative history or in *F.W. Myers* that compels the conclusion that adjustments for differences in circumstances of sale be directly related to the sales under consideration *in ESP transactions.* While it is true that under 19 CFR § 353.15 adjustments are limited, "in general", to circumstances of sale having a "direct relationship to the sales which are under consideration", the provision for the ESP offset is expressly deemed a "[s]pecial rule".

Second, the legislative history of the Trade Agreements Act of 1979 strongly indicates that Congress regarded the ESP offset as an adjustment for differences in circumstances of sale. On this score, the ESP offset regulation was specifically

called to the attention of Congress by the Comptroller General in the G.A.O. report of March 15, 1979, *supra*, at 24. Significantly, both the G.A.O. report and the regulation directed the ESP offset to Congress's attention as a *circumstances of sales adjustment.*

▪▪ Third, although the legislative history of the Trade Agreements Act of 1979 reveals that the new term "United States price" was utilized to incorporate the existing terms "purchase price" and "exporter's sales price" *(S.Rep.No.96–249, 96th Cong., 1st Sess. 93 (1979)),* I see nothing in the legislative history cited by SCM that indicates Congress thereby intended to preclude the ESP offset practice (which had been called to its attention) because a similar offset was not permissible in purchase price transactions. Had Congress intended to devitalize the "Special rule" granting an ESP offset, it surely would not have contemplated that "Regulations will establish groups of adjustments based on types of adjustments currently recognized, that is differences in circumstances of sale * * *". *H.R.Rep.No.96–317, 96th Cong., 1st Sess. at 76 (1979).*

IV.

## ADJUSTMENTS FOR INLAND FREIGHT AND PACKING COSTS

Commerce's early determination of antidumping duties made allowances in determining the foreign market value of the PETs imported by Brother and Silver for differences in Japanese inland freight charges and differences in packing costs incurred in sales in the home market and for export to the United States. 45 FR 53853–55. SCM contends that these adjust-

---

**15.** While Brother and Silver do not challenge the ESP offset adjustments granted by Commerce, both parties complain that the ESP offset regulation does not go far enough in that it limits the deduction from "foreign market value" to the amount of the actual selling expenses incurred in the United States. They argue that logically there should be a deduction from the home market price for *all* actual selling expenses, as is done for United States price. We need not address this argument here, since, as noted, there is no challenge by Brother and Silver to the ESP offset deduction made by Commerce.

ments are contrary to the statutory definition of foreign market value in section 773(a) of the Act, the legislative history, basic rules of statutory construction and regulatory practice of the Treasury, and are unsupported by substantial evidence.

■ I conclude, however, that SCM's contentions have no merit because the allowances for inland freight and packing cost differentials were properly granted in determining the foreign market value as differences in circumstances of sale.

During the 1957 hearings on the proposed amendment to the Antidumping Act of 1921 respecting the proposed provision for other differences in circumstances of sale, Treasury advised Congress that in making fair value comparisons it was necessary to reduce the two prices being compared to comparable terms; and that in its simplest form, the calculation could ordinarily be made by taking the "f.o.b. factory price" for both the sale to the United States and for home consumption.[16] Treasury also provided examples of typical price comparisons which showed adjustments to both the sales price in the foreign market and for export to the United States relative to inland freight. Furthermore, Treasury's report to Congress explained that where packing charges were an element in the price, an adjustment would be made so that the differences between the charge for home-consumption and the often more expensive charge for export packing would cancel out. Thus, Congress was well advised of the fact that allowances were being made to foreign market value for both inland freight charges and differences in packing costs prior to the enactment of the 1958 amendment. Yet, Congress took no steps to change the Treasury's practice, but proceeded to enact the amendment.

The 1960 Customs regulation, which implemented the 1958 amendment to the Antidumping Act, specifically drew attention (example 7) to the fact that inland freight charges in the home market would be considered as a circumstance of sale and would be taken into account in determining dumping margins. See 25 FR 3948, 95 Treas. Dec. 229, 246, T.D. 55118 (1960). In 1979, Congress reenacted the provision for other circumstances of sale (section 773(a)(4)) in substantially the same form as it existed under the Antidumping Act of 1921 (section 202(b) and (c)) without making any exception for inland freight charges and differences in packing costs. Moreover and as previously noted, the legislative history of the Trade Agreements Act of 1979 shows that Congress intended that the law be administered consistently with existing administrative precedents (see *S.Rep.No.96–249, supra,* at 106). Also, the Comptroller General's Report to Congress, *supra,* at 25, shows that in comparing prices in the two markets, deductions were made from the prices being compared for inland freight. Hence, as previously observed, Congress must be deemed to have acquiesced in Commerce's administrative practice, which is entitled to great deference. *Zenith v. United States, supra.*

■ SCM, however, advances the argument that the inland freight charge and

---

**16.** The Customs Simplification Act of 1956, Pub.L. 927, 84th Congress, required the Treasury Department to submit a report to Congress with recommendations for amendments considered desirable or necessary to improve enforcement of the Antidumping Act of 1921. Treasury submitted its report to Congress on February 7, 1957, and it was incorporated into the subsequent hearings. See *Report of the Secretary to the Congress on the Operation and Effectiveness of Antidumping Act and on Amendments to the Act Considered Desirable or Necessary,* Hearings before the House Ways & Means Committee on H.R. 6006, 6007 and 5120, 85th Cong., 1st Sess. (1957), pp. 11–29. See also Treasury Department "Explanatory Memorandum", *Hearings Before the Senate Committee on Finance on H.R. 6006 to Amend Certain Provisions of the Antidumping Act of 1921,* 85th Cong., 2d Sess. 19 (1958). Said memorandum states: "Other circumstances of sale would be selling costs, restrictions affecting value, commissions, *differences in inland freight costs,* and other items affecting the price of merchandise in one market as compared with another." [Emphasis added.]

packing cost adjustments were improper because the statute (section 773(a)(1)) explicitly requires the inclusion in foreign market value of the cost of all containers and coverings and all other costs, charges and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, but makes no specific provision for an adjustment respecting cost differences. On this basis, SCM reasons that there can be no downward adjustment for inland freight and differences in the costs of packing as "other differences in circumstances of sale" under section 773(a)(4). SCM further argues that an adjustment for differences in packing costs pursuant to section 773(a)(4) renders superfluous the language in section 773(a)(1) requiring that, in determining foreign market value, the transaction price be "increased by, when not included in such price, * * * " the cost of packing. Finally, SCM urges that the granting of the downward adjustment for the differences in packing costs violates the rule that statutory provisions shall be read in pari materia.

■ SCM's arguments must be rejected, since its construction of the statute would render inoperative the provision for adjustments for differences in circumstances of sale and would violate the rule that statutes are to be construed in pari materia. Of course, it is correct that under section 773(a)(1) the specified costs, charges and expenses must be included in the basic price of the goods when the authority begins the calculation process. But since the statute requires that the basic price be adjusted pursuant to section 773(a)(4) when differences in circumstances of sale exist, obviously the initial prices must be adjusted to reflect such differences when they are shown to exist. Fundamentally, the statute must be construed as a whole, which embraces the provision for adjustments in section 773(a)(4). These adjustments may be "downward" as well as "upward". Accordingly, if inland freight and/or packing costs are higher for sales made in the home market than in sales to the United States, the home market price should be adjusted downward, relative to the United States

price, to reflect the differing circumstances that exist. Of course, the converse would be true if these types of costs were higher for sales to the United States.

Finally, since the administrative record contains evidence of the costs supporting the inland freight and packing adjustments, and since for purposes of making adjustments to foreign market value pursuant to section 773(a)(4) seller's costs are sufficient (see Point II supra), the allowances are supported by substantial evidence in the record.

V.

## ADJUSTMENT FOR AFTER–SALE REBATES

In its early determination of antidumping duties, Commerce made adjustments to the foreign market value of PETs sold in Japan by Brother and Silver for certain after-sale rebates. 45 FR 53854, 53855. SCM contests the allowance of these rebates as adjustments for differences in circumstances of sale. Specifically, SCM identifies Silver's after-sale volume rebates and Brother's monthly and periodic after-sale rebates as the subject of its attack upon Commerce's allowances for rebates.

■ SCM contends: first, that the rebates given by Brother and Silver are not "directly related" to the sales under consideration; second, that the values of the various rebates, even if directly related, are not quantifiable; third, that the values upon which the adjustments were granted to Brother and Silver were not based upon actual values, but rather upon "estimates, approximations, or averages," contrary to the holding in F.W. Myers; and finally, that the adjustments for rebates constituted a misapplication of statutory requirements rendering them contrary to law.

We first summarize the pertinent facts established by the administrative record. Silver granted volume rebates to Japanese customers for purchases of targeted quantities of certain Silver typewriters. Commerce's adjustment to foreign market value

was calculated on the basis of the expense to Silver in granting these after-sale volume rebates to two domestic purchasers—Company A and Company B.

The rebates granted by Silver to Company A and Company B were for the sale of manual and electric typewriters, and as to Company B, included an additional rebate for the sale of cash registers. In order to determine the rebate expenses attributable to sales of PETs, Commerce initially computed the ratio of total PET sales in yen to the total yen amount of all sales subject to the rebate program for Company A and Company B. Multiplying this percentage by the total rebate amount granted to companies A and B individually resulted in the two "total-volume amount" figures (one for Company A and one for Company B), representing total PET rebates paid each. Commerce then computed the percentage of PET sales attributable to each relevant model on the basis of volume of sales in yen, and multiplied each of these percentages by the yen amount of rebates granted to each company for PETs. This calculation gives the yen amount of rebates for all sales of each particular model PET which, when divided by quantity sold, gives the rebate per unit allowed as an adjustment to foreign market value.

Turning to Brother's rebates, as noted above SCM has challenged two types (monthly and periodic) which Commerce allowed as adjustments to the foreign market values of Brother's PETs. The monthly rebate was granted to three classes of purchasers: Franchised Office Equipment Dealers, Franchised Dealers selling other Brother products, and University Co-op Stores (hereinafter referred to as "Franchised Dealers", "Other Dealers" and "Co-op Stores", respectively). For Franchised Dealers and Other Dealers, the rebate was a fixed yen amount per unit, which was determined by the number of purchases of all typewriters (manual and electric). For the Co-op Stores the rebate was a percentage of the total yen volume of purchases of all portable electric typewriters. Since the rebate for Franchised Dealers and Other Dealers was a fixed yen amount per unit,

the rebate was computed by dividing the total yen expense incurred for the program by the number of typewriters sold (manual and electric). For the Co-op Stores, a different calculation was utilized. Since the actual amount of rebates paid by Brother was based on a percentage of total PET sales volume, Commerce allocated the expense among the various models according to the comparative sales amount of each model, and then divided by the number of units of each model sold.

The second rebate program challenged by SCM involves the periodic rebate, granted only to the Franchised Dealers. That rebate was a fixed yen amount, determined by the total number of typewriters (manual and electric) purchased during a six-month period; and the per unit expense was calculated by dividing the total amount incurred for this program by the number of units sold during the six-month time period.

SCM's argument that Silver's rebates were not directly related to the sales under consideration is premised upon three grounds: (1) the rebate program was not based upon "particular sales", but total sales, and hence the payments were not "rebates" but rather general "goodwill expenditures"; (2) the rebate program was conducted over a period of time which did not exactly coincide with the time period of the investigation, and therefore, sales other than those under consideration were included in the calculation, thus negating any direct relationship; and, (3) the statute requires that foreign market value shall reflect home market prices at the time of exportation of the merchandise to the United States so that after-sales volume rebates do not qualify as an adjustment.

With respect to Brother's rebates, SCM attacks only the fact that the rebates were based upon total sales and not particular sales. Accordingly, my comments on this aspect of the rebates are equally applicable to both Silver's and Brother's rebates.

Initially, we consider SCM's argument that allowances were improperly granted by Commerce for the rebates because they

were not "directly related" to the home market sales under consideration.

I am unable to agree with SCM's position. The fact that rebates were granted on the predicate of total sales of PETs, manual typewriters and cash registers does not negate the direct relationship of the rebates to sales of any one line of Silver products. The amount of rebates attributable to each of the different products was accurately quantifiable as a percentage of the total yen volume amount of all of the involved products, and the per unit (by model) rebate amount was just a matter of simple arithmetical calculation.

Congress intended that adjustments to "foreign market value" should be permitted if they are reasonably quantifiable and directly related to the sales under consideration. Thus, the *House report* states:

> The Committee intends that adjustments should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration and if there is clear and reasonable evidence of their existence and amount.

*H.Rep.No.96–317, 96th Cong., 1st Sess., p. 76 (1979).*

Here, the challenged rebates for PETs are clearly identifiable, easily quantifiable, and there is substantial evidence of their existence and amount.

SCM alleges that because the rebate amounts per unit are predicated upon volume sales over a period of time different from, but including, the period of time subject to the investigation, they were impermissibly based upon sales not under consideration, and therefore are not directly related to the sales under consideration. This contention is without merit. The fact that rebates to be given at the end of a certain period, for certain items, can only be ascertained at the end of that period, does not nullify the direct relationship between the end-of-period rebate and the sales throughout that period. The end-of-period rebate represents an actual (not an approximate, estimated, or averaged) reduction in the selling prices, and is directly attributable to the total of all the individual typewriter sales, with each individual typewriter accounting for an allocable portion of the total rebate. Accordingly, the PET rebates are directly related to the sales here under consideration.

 SCM also points to the language in 19 U.S.C. § 1677b(a)(1) that "[t]he foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States— * * * *", and contends that this language precludes consideration of the after-sale rebates, even if they ultimately reduce the actual price of the merchandise. I am unable to agree with that interpretation: it ignores the statutory directive in § 1677b(a)(4) that, in determining foreign market value, allowance shall be made for differences in circumstances of sale and Congressional intent that adjustments be made in order to achieve comparability between the prices being compared. *S.Rep. No.96–249, 96th Cong., 1st Sess., p. 94 (1979).* Whether the purchaser receives a price discount at the time of sale or an after-sale rebate, the substance of the transaction is the same, and a fair price comparison must take the price reduction into account.

Quoting from *F. W. Meyers,* SCM argues that "a basic concept of all value determinations by the court is that they must be based upon proof of *actual* costs or prices— *not* estimates, approximations or averages." (Emphasis copied.) 72 Cust.Ct. at 234. Clearly, this *F.W. Meyers* teaching does not preclude the administering authority from allocating or apportioning *actual* costs among the various items to which they are attributable. For example, determination of a per-unit price after deduction for freight and packing cannot be made without allocations. Where a company pays freight or packing charges quarterly or monthly, such charges must be allocated to individual sales. Where a charge is spread across sales of more than one unit, it must be allocated to individual sales or the per-unit price will not reflect the charges. The same is true for rebates.

 In brief, the rebate adjustments were not approximations or estimates, but allocations derived from an actual total rebate amount. So long as the foreign market value reflects actual net selling prices to the purchasers on the date of exportation to the United States, which are known at the time Commerce conducts its antidumping duty investigation, the objectives of 19 U.S.C. § 1677b(a)(4) are satisfied. Hence, the adjustments for rebates granted to Brother and Silver are in compliance with the statutory criteria, Congressional intent, and are supported by substantial evidence.

## VI.

## THE ADJUSTMENT TO FOREIGN MARKET VALUE FOR ADVERTISING EXPENSES

Commerce's early determination of antidumping duties allowed an adjustment to the foreign market value of Brother's PETs under 19 CFR § 353.15(b) for certain advertising expenses incurred by Brother in the home market. 45 FR 53853, 53855 (1980). This regulation pertains to the circumstances of sale provision and provides for an adjustment to foreign market value for advertising and other selling expenses assumed by a seller that are attributable to a later sale by a purchaser.

 SCM contends that the advertising expense adjustments lack the requisite "direct relationship" to the particular sales under consideration because: (1) the adjustments covered general office expenses; (2) the adjustments were based upon advertising of multiple product lines; and (3) the adjustments were grounded upon advertising which was calculated to enhance Brother's corporate image rather than to promote specific sales. In addition, SCM challenges the apportionment of the advertising expenses among the various PET models, maintaining that the allocation was based upon "estimates", contrary to *Myers*.

Regarding the claim for direct advertising expenses, Commerce determined that most, but not all, of the expenses claimed by Brother were appropriate for adjust-

ment. However, Commerce rejected the methodology utilized by Brother, based upon space apportionments (except in one advertisement), in calculating the per model adjustment, and instead utilized a method of allocation based upon a "yen volume amount of sales" percentage. Brother, however, does not contest the calculation methodology utilized by Commerce.

I have carefully reviewed the method used by Commerce in determining the adjustments for advertising expenses, and I see nothing in the administering authority's method of calculation or apportionment of expenses that is unreasonable or unrelated to the sales under consideration.

SCM argues that "[t]o the extent general office expenses (salaries, overhead expenses and the like) were included in the adjustment for 'certain advertising expenses', the ITA's [Commerce's] action was improper, since such expenses are not directly related to the sales under consideration * * * ". Defendant and Brother contend that the general office expenses were considered by Commerce as indirect expenses adjustable in accordance with the ESP offset.

I find that the "general office expenses (salaries, overhead expenses and the like)" were not included in the adjustments made for direct advertising expenses, but rather, such general office expenses were correctly allowed as part of the ESP offset, as claimed by defendant and Brother. Commerce's antidumping duty determination, 45 FR 53853 (1980), stated the following with regard to the basis of comparison utilized in assessing Brother's dumping duties:

2. *Foreign Market Value Compared to Purchase Price.*

\* \* \* \* \* \*

Adjustments to foreign market value were made for differences in circumstances of sale in accordance with section 773(a)(4)(B) of the Act . . . and § 353.15 of the Commerce Regulations (19 CFR 353.15, 45 FR 8194). Section 353.15(a) of the Regulations provides for adjustment to foreign market value for differences in circumstances of sales which bear a direct

relationship to the sales which are under consideration. Section 353.15(b) provides for adjustments to foreign market value for advertising and other selling expenses assumed by the seller that are attributable to a later sale by the purchaser. We have determined that adjustment to foreign market value is warranted for Brother for ... certain types of *direct* advertising expenses. [Emphasis added.] 45 FR at 53854–53855.

Thus, it appears that in comparing the foreign market value with purchase price for Brother's PETs, Commerce specifically limited the adjustment to foreign market value to those *direct* advertising expenses assumed by Brother and attributable to a later sale by the purchaser. Consequently, the only expenses allowed for advertising were those attributable to the various invoices submitted by Brother, covering each of the advertisements for which adjustments were claimed.

In contesting the "direct relationship" of Brother's direct advertising expenses to the particular sales under consideration, SCM insists that advertisements run during February 1980 must necessarily be related to sales to Brother's customers in the fourth quarter of 1979 on the assumption that Brother's customers would have placed their orders for the merchandise to be advertised at some date sufficiently in advance of the advertisement to permit the receipt of the merchandise at their warehouse or store before the advertisement was run. So, according to SCM, if Brother's advertising expenditures were "directly related" to any PET sales, they were related to purchases made in the fourth quarter of 1979, and were not directly related to the sales under consideration, which sales occurred in the January-May 1980 time period.[17] While *some* lead time is obviously necessary for Brother's purchasers to receive the particular typewriters under consideration in Commerce's investigation, there is no intimation in the record of the

amount of lead time required in Brother's Japanese distribution process. Hence, Commerce's adjustments for advertising expenses incurred in February 1980 may not be assumed to be improper, and to the contrary, are presumptively correct.

SCM argues further that the "direct relationship" of the advertising expenses to the sales under consideration is abrogated regarding those advertisements which included products other than PETs (*i.e.*, manual typewriters). In support of this argument, SCM cites *Motorcycles from Japan*, 43 FR 35140, 35141 (1978). There, advertising expenses were allowed by Treasury as adjustments to foreign market value in those instances where a reasonable allocation of advertising expenses among various *types* of motorcycles was established. Here, Commerce accepted Brother's allocation method as a reasonable apportionment of advertising expenses among the two types of typewriters (manual and electric). Then, after rejecting Brother's further model-by-model allocation based upon space, Commerce utilized the identical method of allocation used in the *Motorcycles* case, *i.e.*, value of sales of each relevant PET model.

Plainly, an advertisement covering both PETs and manual typewriters is "directly related" to sales of the models advertised; and since Commerce permitted a reasonable allocation of advertising expenses between the electric and manual typewriters, Commerce properly adjusted the foreign market value of Brother's PETs for directly related advertising expenses in accordance with 19 U.S.C. § 1677b(a)(4)(B) and 19 CFR § 353.-15(b). Moreover, inasmuch as the allocation of advertising expenses was bottomed upon actual verified costs apportioned on a rational basis, Commerce did not contravene the *F.W. Myers* proscription of estimates or approximations.

SCM also attacks Commerce's allowance of adjustments to foreign market value of Brother's PETs for advertising expenses on the ground that some of the advertisements

---

17. Defendant concedes that Brother must advertise directly to its purchasers customers to qualify as an assumption of advertising ex-

penses attributable to a later sale under 19 CFR § 353.15(a) and (b), as claimed by SCM.

made reference to Brother's commemoration of the production of its ten millionth typewriter, and therefore such advertisements were merely promoting Brother's corporate image. But those references do not constitute merely a "general image campaign", as urged by SCM. Here, each of the advertisements in question refers specifically to Brother's typewriters, either by words or by actual pictures. A "general image campaign", on the other hand, is more in the nature of making consumers aware of the company's concern for consumers and the quality of its workmanship and product in general, but do not tout a specific product.[18] Where, as here, the particular product in question (*i.e.*, typewriters) is the sole subject of the advertisement, such advertisement does not lose its direct relationship to the sales of that product under consideration. While the advertisements also mention a giveaway program whereby purchasers of Brother typewriters would receive a free transistor radio, that program obviously was intended to entice customers to purchase a Brother typewriter.

In short, each of the twelve advertisements for which adjustments were allowed by Commerce as direct advertising expenses was financed entirely by Brother and aimed specifically at ultimate consumers, *viz.*, the "later sales" that Brother's purchasers hoped to transact. As such, the adjustments were made in accordance with section 353.15(b) of the regulations, and fully complied with the statutory requirement that adjustments be made for "differences in circumstances of sale." Further, in light of the fact that the adjustment to the foreign market value of Brother's PETs for advertising expenses is predicated upon actual costs, and because each expense is identifiable and quantifiable on a per unit basis (by model), grounded upon a reasonable allocation method, the adjustment was proper.

---

18. Defendant cites a good example of a "general image campaign" type advertisement commonly seen in the United States today. Thus, in an oil company advertisement (frequently characterized as a "public message") a commentator discusses the environmentally sound

VII.

## THE ADJUSTMENT TO FOREIGN MARKET VALUE FOR THE COST OF MATERIALS AND LABOR OF CERTAIN ACCESSORIES AND PRINTED MATERIALS

Commerce's early determination of antidumping duties allowed an additional adjustment to foreign market value for a number of items which, it determined, constituted differences in physical characteristics of the PETs being compared pursuant to Section 773(a)(4)(C) and 19 CFR § 353.-16, limited to the difference in cost of materials and labor. SCM challenges the allowance regarding certain accessories (principally typewriter ribbons and cassettes) and printed materials (*i.e.*, instruction manuals) furnished by Brother relating to sales of PETs.

SCM advances the argument that since the "merchandise" in this case consists of PETs, the accessories and literature are not physical characteristics of the portable electric typewriters in the markets being compared, and therefore, no adjustment is warranted for the claimed differences in accessories and printed materials.

■ I hold that SCM's interpretation unduly restricts the scope of the term "merchandise" in 19 CFR § 353.16 because such interpretation ignores the fact that imported merchandise may include accessories and/or manuals which are used in conjunction with the principal article being sold. In the instant case, the merchandise sold in Japan comprised PETs with certain accessories and a large-size pamphlet including a text on how to type, while the merchandise sold for export to the United States consisted of PETs without accessories and with a small-size pamphlet which did not include a textbook on how to type. By consequence,

means by which new oil discovery and production are being achieved by the advertising oil company, and how the world will be safe and well provided for in generations to come, but rarely, if ever, mentions any specific product.

there was an obvious difference in physical characteristics between the product sold in Japan (PETs with accessories and a large-size pamphlet containing a textbook on how to type) and the product sold for export to the United States (PETs without the particular accessories and with a small-size pamphlet which did not include a textbook on how to type). Inasmuch as there were differences in the physical characteristics of the merchandise sold in Japan vis-a-vis the merchandise sold for export to the United States, Commerce properly allowed an adjustment to foreign market value for the difference in cost of labor and materials.

### VIII.

### BROTHER'S CLAIMED ADJUSTMENT FOR EXPENSES OF TRANSISTOR RADIO GIVE–AWAY PROGRAM

As we have seen, Commerce made adjustments to foreign market value for certain advertising expenses incurred by Brother. As part of its advertising expenses, however, Brother claimed a further adjustment for the expense of transistor radios given away as part of its commemoration activities promoting the sale of Brother's ten millionth typewriter. These expenses were disallowed by Commerce in its early determination of antidumping duties. 45 FR 53853, 53855 (1980). As also noted, *supra*, Brother has filed a cross-motion for summary judgment contending that the promotional expenses should have been allowed as an adjustment to foreign market value. Brother's cross-motion is opposed by SCM and the Government.

Commerce disallowed the claimed adjustment for the promotional expenses on the ground that the information submitted by Brother as to the number of radios purchased by Brother and the number of typewriters (PETs and manuals) sold during the period of investigation did not correspond.

■ Commerce's disallowance of the promotional expenses as an adjustment to foreign market value is sustained. The record fails to establish the numerical relationship between the number of transistor radios purchased by Brother and the number of radios actually given away during the period of the investigation. Factually, the record even fails to show that the transistor radios had, during the period of the investigation, been distributed by Brother to its purchasers for dissemination. As claimed by the government, it appears that the verified information as to the number of radios purchased by Brother and the number of typewriters sold during the period of investigation did not correspond. Stated differently, Commerce was not satisfied that all purchasers of Brother typewriters actually received the give-away radios. Under these circumstances, Commerce properly disallowed an adjustment for the claimed promotional expenses to the foreign market value. Brother's cross-motion for summary judgment is therefore denied insofar as it challenges Commerce's disallowance of an adjustment for Brother's promotional give-away expenses.

### IX.

### CONCLUSION

■ In summary, I have carefully considered the excellent briefs and oral arguments of counsel for the parties [19] and have concluded that the regulations followed by Commerce in making the adjustments to foreign market value challenged by SCM do not frustrate the Congressional policy underlying the antidumping law. If, as this Court believes, a fair and equitable comparison of the United States price and the foreign market value is the ultimate goal of the statutory adjustment for differences in circumstances of sale, the regulations attacked by SCM are reasonable, effectuate the Congressional scheme, and were properly applied by Commerce, the administering

---

**19.** It will bear repetition to express the Court's sincere appreciation for counsel's "superb arguments" and to reiterate that counsel "have

authority, under the facts and circumstances in this case.[20]

Brother's claimed adjustment for the promotional give-away program must fail for lack of the necessary proof of entitlement.

I find no issue of material fact as to which there is a genuine dispute, and conclude that the Government is entitled to summary judgment as a matter of law with respect to all claims asserted by SCM and Brother. Accordingly, it is hereby ordered:

1. that the early determination of antidumping duties by Commerce published on August 13, 1980 is affirmed in all respects;

2. that SCM's motion for summary judgment is denied;

3. that the Government's cross-motion for summary judgment is granted;

4. that Brother's cross-motion for summary judgment is denied insofar as it challenges Commerce's disallowance of an adjustment to foreign market value for Brother's promotional give-away expenses; Brother's cross-motion for summary judgment is granted insofar as Brother seeks to sustain the early determination of antidumping duties, as that determination relates to Brother's PETs;

5. that Silver's cross-motion for summary judgment sustaining the early determination of antidumping duties as that determination relates to Silver's PETs is granted.

It is further ORDERED that the United States Customs Service shall liquidate all entries, the liquidation of which have been suspended pursuant to this Court's order of December 30, 1980, 1 CIT—, Slip Op. 80–17, 507 F.Supp. 1015 (1980), in the amounts specified in Commerce's early determination of antidumping duties.

The foregoing constitutes the decision and order of the Court.

---

all acted in the highest traditions of our profession" (Tr. Oral Arg., 139–40).

**20.** Silver points out that the dumping margins found by Commerce in its original fair value investigation include the adjustments made to foreign market value pursuant to 19 CFR § 353.15(c), and (d) predicated upon the ESP offset and the cost of the differences in circumstances of sale, which adjustments are now challenged by SCM for the first time when made in the early determination of antidumping duties. Hence, argues Silver, if Commerce's decision under section 736 (the early determination of antidumping duties) is illegal or improper, the results of the original fair value investigation are also illegal or improper. However, in view of the conclusions reached in this case, it is unnecessary to address this issue.